NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-09926


COMMONWEALTH  vs.  THOMAS LALLY.


Norfolk.     November 6, 2015. - March 3, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide.  Deoxyribonucleic Acid.  Evidence, Prior consistent
    statement, Prior misconduct, Subsequent misconduct.
    Practice, Criminal, Capital case, New trial, Assistance of
    counsel, Argument by prosecutor, Redaction.



Indictment found and returned in the Superior Court
Department on January 21, 2003.

The case was tried before Charles M. Grabau, J., and a
motion for a new trial, filed on June 16, 2010, was heard by
Kenneth J. Fishman, J.


Catherine J. Hinton (Charles W. Rankin with her) for the
defendant.
Pamela Alford, Assistant District Attorney, for the
Commonwealth.


HINES, J.  The defendant, Thomas Lally, was convicted by

jury of murder in the first degree on theories of deliberate

premeditation and extreme atrocity or cruelty.[1] Represented by new counsel, the defendant filed a motion for a new trial based on claimed errors at trial: (1) admission of deoxyribonucleic acid (DNA) evidence;[2] (2) admission of an audiotape of prior consistent statements made by the Commonwealth's principal witness, a cooperating codefendant; (3) admission of a cooperating codefendant's plea agreement without proper redaction; (4) admission of prior bad act evidence; and (5) ineffective assistance of counsel for improperly advising the defendant to testify and for failing to call surrebuttal witnesses.[3] A judge of the Superior Court who was not the trial judge denied the defendant's motion after an evidentiary hearing. The defendant appealed and it was consolidated with his direct appeal, which raises the same issues. We affirm the order denying the defendant's motion for new trial as well as the defendant's conviction, and we discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

---

[1] The defendant also was indicted for conspiracy to commit murder, but that charge was placed on file.

[2] The defendant also argues that he was deprived of a fair trial due to prosecutorial misconduct in this regard.

[3] The defendant also argued in his motion for a new trial that counsel was ineffective with respect to joint venture instructions and certain motions. The judge rejected those claims, and the defendant does not dispute that decision on appeal.

Background.  We recite the facts as the jury could have found them, reserving other facts for later discussion.  On December 19, 2001, the defendant hit the victim with a frying pan and tea kettle and then suffocated her until she died.  He moved her body to the bottom of a staircase and made it appear to be an accident.

The night before the murder, the defendant slept at the victim's house with two friends, Jason Weir and the victim's great-nephew, Anthony Calabro.[4]  The victim, eighty-four years old at the time of her death, owned a three-family house in Quincy.  She lived in the second-floor apartment with Anthony, who had moved in with the victim the summer before the murder.[5]  Anthony was an intended beneficiary of her estate when she died.

Weir was sixteen at the time of the murder, four years younger than the defendant and two or three years younger than Anthony.  Both Weir and the defendant lived with their own parents, although Weir had lived with the defendant for a few months during the summer of 2000.  The defendant and Weir both desired to move out of their parents' homes.  During the fall of 2001, the defendant stayed at the victim's house approximately five nights per week and Weir stayed there on the weekends.

---

[4] Because Anthony Calabro shares a surname with the victim, we refer to him by his first name.

[5] Anthony's grandmother lived in the first-floor apartment and his uncle lived in the third-floor apartment.

The defendant often commented about how he and Anthony could kill the victim and get her money. Specifically, the defendant said, "Wouldn't it be funny if we pushed her down the stairs and got her money?"; "We can kill her and no one would find out"; and that he could "knock her over the head with a blunt object and then place her at the bottom of the stairs to make it look like an accident." The defendant referred to the victim as a "bitch," a "cunt," and a "douchebag."

On the day of the murder, the defendant, Weir, and Anthony woke at approximately noon. That afternoon, the defendant obtained the victim's frying pan and told Weir, "Today's the day." Anthony went outside with the defendant's dog. The victim saw the defendant enter the kitchen with her frying pan and scolded him for taking her things without asking. She put the frying pan in the pantry. The defendant retrieved it and then used it to hit her on the head. Next, he hit her on the head with a tea kettle, put his hand over her mouth and nose to suffocate her, and said, "Just go. Anthony wants it this way."

Weir testified that he did not assist the victim because he was afraid, "freaking out," and crying. The defendant told him, "We all wanted this house" and "we're in it together," and then told Weir to help him move the body to the steps. At the defendant's urging, Weir helped move the victim down the front stairs, which were infrequently used. Weir testified that he

only helped with the first few steps before he "[c]ouldn't do it" anymore. The trio got in the defendant's vehicle and Anthony drove Weir home. During the ride, the defendant said that they needed to "bury the stuff" -- referring to the frying pan and tea kettle used in the attack, and a floor mat, some pot holders, and a newspaper from the victim's house -- at Meadowbrook Pond in Norton.

Anthony and the defendant later returned to the victim's home; just before midnight, a 911 call was placed reporting that an elderly woman had fallen down. When the police arrived, the deceased victim was lying at the bottom of the stairs. Anthony and the defendant were upstairs in the victim's home. The defendant had a welt on his nose, fresh scratch marks on his right cheek, and a bite mark on his arm. He explained to police that he received the injuries during a fight with Anthony the prior evening.

A State police trooper noted suspicious circumstances in connection with the claim that the deceased had fallen down the stairs, including dust covering the handrail, the absence of blood on the wallpaper or stairwell although the victim suffered significant blood loss, and a urine stain that was not anatomically correct for the position of the body. Conversely, there were conditions consistent with a fall -- the deceased was wearing footwear that was in "deplorable shape" and there was a

large trash bag next to her that she could have been carrying at the time.[6]  He requested a full autopsy.

The medical examiner performed a rape kit to help to determine the cause of death, which included taking hair samples; DNA samples from the mouth, vagina, anal region, and anus; and fingernail clippings and scrapings.  He noted blunt trauma to the top of her head, a fracture of the seventh cervical vertebra, rib and clavicle fractures, and injuries to her left hand.  After determining that the majority of the victim's injuries were consistent with a fall, he ruled the cause of death as blunt neck trauma and the manner of death as "fall down stairs."[7]

The defendant told Weir, "We fooled everybody," and told another friend that it was a "perfect crime."  He gave friends varying explanations for the scratches on his face, telling some that he received the scratches during a fight with Anthony and others that his dog scratched him.

In March 2002, Anthony wrote two checks totaling $5,000 to the defendant and two checks totaling $8,000 to Weir.  He also purchased a truck for the defendant and spent approximately

---

[6] Two neighbors and Weir testified that the victim routinely walked down the back stairs to remove her trash using small bags.

[7] The medical examiner explained that the injury to the top of the victim's head was not consistent with a fall.

$50,000 on equipment for a band that Weir was in. The three regularly stayed at the victim's home until shortly before it was sold, in July, 2002. Anthony received approximately $250,000 in proceeds from the sale.

In the summer of 2002, Weir was with a friend near Meadowbrook Pond and saw the frying pan, the tea kettle, two pot holders, and the welcome mat out in the open. After telling the defendant about what he had observed, the two went to Meadowbrook Pond and the defendant threw the objects in the water.

In October, 2002, Weir's close friend, James Morel, commented that it was a "coincidence that [the victim] wound up the same way [the defendant] said she was going to." Weir then told Morel about the murder. Morel alerted the Norton police to the information he had received about the victim's death. State police Trooper Brian Brooks met with Morel and asked him to wear a wire and meet with Weir again. Morel agreed. When Morel next met with Weir, the police followed them for three hours and recorded the pertinent parts of their conversation.

During the meeting, Weir told Morel that the defendant had killed the victim, and although he helped move the body and clean up, he did not participate in the killing. Weir guided Morel to Meadowbrook Pond and pointed to the location where the items were disposed of after the murder. Morel later

accompanied police to the pond and the police recovered a welcome mat, two pot holders, the top of a tea kettle, and newspaper with a December, 2001, date. Subsequently, the police drained the pond and found a tea kettle and a bent frying pan.

Based on this information, Weir and the defendant were arrested on October 25, 2002, and charged with murder in the first degree. Weir agreed to cooperate with police in exchange for having his charge reduced to manslaughter with a prison sentence of ten years.

DNA profiles for the defendant, Weir, Anthony, and Morel were compared to male DNA found on three samples from the victim's rape kit: fingernail scrapings, fingernail clippings, and a perianal swab. In the initial testing, all four were excluded as contributors to the perianal swab, which had been contaminated with male DNA from the State police crime laboratory. Weir, Anthony, and Morel were excluded as contributors to the fingernail scrapings and the fingernail clippings, but the defendant could not be excluded from either.

The defendant testified that Weir killed the victim and that he received the injuries observed by police the night of the murder when he attempted to intervene on the victim's behalf. His stepsister testified to examples of Weir's behavior that made her nervous and his stepfather testified to numerous arguments between Weir and the defendant.

Discussion.  1.  Standard of review.  The primary issue at trial was whether the defendant or Weir killed the victim.  On appeal, the defendant does not contest the sufficiency of the evidence at trial.  Rather, he contends that because the asserted trial errors deprived him of a fair trial and that trial counsel provided ineffective assistance, the judge wrongly denied his motion for a new trial.

Where the defendant's appeal from the denial of his motion for a new trial has been consolidated with his direct appeal, we review both pursuant to G. L. c. 278, § 33E.  Commonwealth v. Lessieur, 472 Mass. 317, 323, cert. denied, 136 S. Ct. 418 (2015), citing Commonwealth v. McGee, 467 Mass. 141, 145 (2014).  Under § 33E, we review the denial of the defendant's new trial motion "to determine whether there has been a significant error of law or other abuse of discretion," McGee, supra at 146, quoting Commonwealth v. Robideau, 464 Mass. 699, 702 (2013), and whether any such error creates a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Leng, 463 Mass. 779, 781 (2012).

Where the defendant's claims are based on ineffective assistance of counsel, and none of the asserted errors was preserved at trial, our § 33E review does not consider "the adequacy of trial counsel's performance" under the rubric of Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  Commonwealth

v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014). Instead, we give the defendant the benefit of a more lenient standard that focuses more narrowly on whether there was error and, if so, whether any such error "was likely to have influenced the jury's conclusion." Id. The burden of proving ineffectiveness rests with the defendant. See Commonwealth v. Montez, 450 Mass. 736, 755 (2008), citing Commonwealth v. Comita, 441 Mass. 86, 90 (2004).

2. DNA evidence. Relying on Commonwealth v. Mattei, 455 Mass. 840, 851-853 (2010), in which we held that nonexclusion DNA results must be presented with statistics explaining the significance of that evidence, the defendant challenges the admission of the polymerase chain reaction (PCR) and Y-chromosome short tandem repeat method (Y-STR) results. He argues that the DNA evidence was erroneously admitted under Mattei because the PCR result was admitted without any accompanying statistical references to the significance of the results, and the Y-STR evidence was admitted with inadequate statistical information. He contends also that the prosecutor compounded these errors by misstating the DNA evidence in the opening statement and closing argument. In addition, the defendant argues that his counsel provided ineffective assistance in connection with the admission of the DNA evidence. More specifically, he contends that defense counsel was

ineffective for failing adequately to inform himself about the admissibility of such evidence, failing to object to or otherwise seek exclusion of the evidence, and failing to cross-examine the Commonwealth's DNA expert competently.

a. DNA evidence at trial. At trial, Jeffrey Hickey, a former DNA analyst with Cellmark Diagnostics laboratory, which later became Orchid Cellmark (Cellmark), testified that the defendant could not be excluded as a contributor to DNA samples taken from the victim's fingernail scrapings and fingernail clippings. He analyzed the DNA using two methods. First, he performed PCR testing, which compares thirteen regions of the DNA taken from the victim against submitted profiles to establish primary and secondary profiles and determine whether a suspect could be excluded as a contributor. Because the PCR test results were inconclusive for the fingernail clippings, Hickey also performed Y-STR testing, which separates male DNA and is frequently used when the analyst is unable to create a primary profile from the mixture of male and female DNA.

From the fingernail scrapings, PCR testing showed that the sample was a mix of male and female DNA, the primary DNA profile was from the victim, a "few secondary types" of DNA were located, and the defendant "could not be excluded as a potential source" of those secondary profiles. Hickey did not provide statistical information to demonstrate the relevance of this

nonexclusion PCR evidence, explaining that Cellmark does not provide statistics on secondary profiles.

From the fingernail clippings, PCR testing was inconclusive in that no primary or secondary profiles could be determined. Once Hickey extracted only the male DNA, however, he was able to produce a Y-STR profile containing twelve regions of DNA. He testified that the male profile created from Y-STR testing "came back to match [the defendant] at all of those regions that we tested." Hickey provided context for this result through statistical analysis, wherein he compared the results of the Y-STR testing to a database of known DNA profiles and determined that the profile occurred in one out of 1,311 Caucasian males, and zero out of 1,108 African-American males, and zero out of 894 Hispanic males. He explained that Y-STR statistics are "quite different" from PCR results -- where you can see numbers in the "billions [or] trillions." In PCR testing, "a match across all of those regions" would allow an expert to opine with a reasonable degree of scientific certainty that a DNA profile belongs to a specific person. Conversely, with Y-STR testing, DNA results cannot discriminate among members of the same paternal line and the statistical likelihood is never any greater than the database available for comparison.

Hickey also testified to contamination of the perianal swab. Specifically, he stated that the defendant, Weir,

Anthony, and Morel were excluded as sources of DNA. Because the swab did not match any of the submitted male profiles, the State police crime laboratory asked Hickey to analyze whether the sample could have been contaminated by employees of Cellmark or the crime laboratory. The swab was consistent with the DNA profile of a male employee working at the crime laboratory. The contaminating employee testified that he had handled all samples that were taken from the victim. Additionally, the employee explained a pretrial revision to his DNA analysis. He testified that he first identified the presence of seminal fluid from the vaginal and perianal swab. However, he later updated his findings to identify the fluid as P-30, which is a protein that can be found in urine.

Trial counsel's cross-examination of Hickey focused on the contamination and Hickey's testimony at trial that the defendant "matches" the Y-STR profile, noting that Hickey stated in his report that the defendant could not "be excluded" as a source of the DNA in the fingernail scrapings, not that there was a match. Counsel's cross-examination of the crime laboratory employee highlighted the contamination and change in identification from seminal fluid to the P-30 protein.

The prosecutor commented on the DNA evidence in her opening statement and closing argument. In her opening statement, she told the jury that the evidence would prove that the defendant

was the "major contributor" to the right fingernail clippings and that Weir and Anthony were excluded. In her closing, she argued that Weir and Anthony were excluded as contributors under both tests, and that the defendant could not be excluded from either. She continued that the reference to nonexclusion was a matter of "semantics," because Cellmark does not "use the term 'match'" for Y-STR testing, but "if you look at it, you'll see all the numbers from [the defendant] correspond to the fingernail clippings."

b. <u>Posttrial DNA evidence</u>. At the motion hearing, the defense presented testimony from Dr. Michael J. Bourke, a forensic scientist retained in 2005 by trial counsel and in 2009 by postconviction counsel, and from trial counsel for the defendant. Dr. Robin Cotton, the former Cellmark laboratory director, testified for the Commonwealth.

As to the PCR evidence from the fingernail scrapings, the defendant argued that it was error to admit the evidence without statistics. In that regard, the defense presented evidence that Bourke alerted trial counsel in a pretrial memorandum to the lack of statistics, advised that "the correct statistic to perform on mixed samples is the combined probability of inclusion," and questioned the admissibility of such evidence without statistics. The memorandum noted that the statistical information was important because the "small to limited number

of loci . . . , and the fact that these loci are mixtures, will result in very modest random match probabilities." Cotton likewise testified that testing only a "few" loci could provide probabilities that are "very much smaller" than the large numbers calculated using a full profile. She also testified that statistical information could have been provided at the time of the 2006 trial if requested; however, the information was not routinely provided when the applicable report was written.

As to the Y-STR results, the defendant argued that DNA results from the Y-STR testing were erroneously admitted without a "confidence interval" allowing for population frequency calculation. The results were presented using a method known in the field as the "counting method," which describes the frequency in which a DNA match is found in a given database. A "confidence interval" adjusts that result to account for sampling errors and identical profiles being passed through a paternal line, and thus increases the likelihood that the same profile could be found in a population.[8] See Scientific Working

---

[8] Dr. Michael J. Bourke testified that there are several methods available to calculate a confidence interval. Under the "division by three" method that he used around the time of trial and the ninety-five per cent calculation suggested by the defendant, Bourke testified that the results of the confidence interval calculation generally produces a result showing that it is approximately three times more likely that a DNA profile may

Group on DNA Analysis Methods, Y-Chromosome Short Tandem Repeat (Y-STR) Interpretation Guidelines, 11 Forensic Science Communications, Federal Bureau of Investigations (Jan. 2009) at § 5.3 (Y-STR Guidelines). Bourke testified that the counting method results "would be misleading without the confidence interval correction." He did not advise counsel about Y-STR deficiencies, but testified that he would have had he been asked. Cotton testified that a confidence interval could have been calculated at the time of trial, but Y-STR testing was in its infancy at the time of the 2005 report and Cellmark's policy did not provide for such a calculation.

The motion judge rejected the defendant's claims, concluding that the defendant had failed to demonstrate that any attempt to exclude the DNA evidence would have been successful because the defendant did not establish that the Commonwealth, if challenged, would have been unable to provide the requested statistical information for either the PCR or Y-STR results. The judge concluded that trial counsel was not ineffective because questioning the DNA evidence was not likely to accomplish "something material for the defense" in light of the defense theory that Weir, not a stranger, was the real culprit, and the case "did not hinge on DNA evidence." Additionally,

---

be found in a population than the number produced by the count method.

although the judge found that the prosecutor did misstate the evidence, he concluded that the error was unlikely to have influenced the jury's conclusion where the evidence was "not central to the Commonwealth's case."

c.  Analysis of the DNA claims.  Although Mattei was decided four years after the trial in this case, our holding was based on reasoning that dated back to 1991, when we required that DNA results indicating a DNA "match" include accompanying evidence of the likelihood of that "match" occurring.  See Mattei, 455 Mass. at 850, citing Commonwealth v. Curnin, 409 Mass. 218, 222 n.7 (1991).  We held that it was error to present nonexclusion DNA results from PCR testing without statistics, especially where the jury heard evidence of "match" statistics placing the likelihood of occurrence in the quadrillions and quintillions, because the jurors could be misled into thinking that the nonexclusion DNA results are similarly conclusive. Mattei, supra at 848 n.17, 853.  We explained that DNA evidence is "of little or no value without reliable evidence indicating the significance."  Id. at 850-851.  Moreover, we noted that nonexclusion evidence presented without statistics could be even more prejudicial than match evidence because jurors could be misled into thinking that nonexclusion results are as

significant as the large numbers typically applicable to match results.[9]  Id. at 856.

i.  PCR evidence.  We first review the defendant's claim that it was error to admit the nonexclusion results from the PCR evidence without statistical information providing context for that result.  The Commonwealth argues that there was no error because counsel made a reasonable tactical decision not to challenge the DNA evidence and, even if it was unreasonable, statistical information could have been provided had the DNA evidence been challenged on that ground.  We agree with the defendant and reject the Commonwealth's argument for two reasons.  First, Hickey testified at trial that there were only "a few secondary types" of DNA identified by the PCR testing.  Although neither side presented evidence at the hearing on the motion for a new trial of what the actual statistics in this case would show, both experts agreed that the frequency of a random match probability based on the limited number of loci available in this case would be "modest" or small.  Where the jury heard evidence that PCR testing could result in "numbers in the billions, trillions," but did not hear that the results in

_____

[9] Prior to the defendant's trial, other jurisdictions required reliable statistics for nonexclusion results.  See, e.g., Dayton v. State, 54 P.3d 817, 818-820 (Alaska App. 2002) (remanding for reliability determination of database used to demonstrate required statistics to accompany nonexclusion testimony).

this case (with less than a full profile) could be significantly less, we cannot say that it was reasonable not to explore the actual statistics before making a decision whether to challenge the evidence.  Second, even if the Commonwealth could have provided statistics had the DNA evidence been challenged on that ground, defense counsel "might have accomplished something material for the defense" by challenging the evidence -- namely, the jury would have been presented with statistical evidence of small probabilities instead of an inference that the numbers could be "in the billions, trillions," or the evidence would have been excluded.[10]  See Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).  See also Mattei, 455 Mass. at 856.

---

[10] Although the defendant's burden in demonstrating ineffective assistance of counsel for failing to file an evidentiary motion has been stated as a requirement to demonstrate that the motion would likely have been granted, see, e.g., Commonwealth v. Walker, 460 Mass. 590, 599 (2011); Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983), the proper question is whether filing of the motion "might have accomplished something material for the defense."  See Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977); Commonwealth v. Saferian, 366 Mass. 89, 99 (1974).  In this case, the Commonwealth asserts that it would have presented statistical evidence if the polymerase chain reaction (PCR) results were challenged, and the record reflects that such evidence would have shown "very modest random match probabilities" that are "very much smaller" than the large numbers often presented with PCR testing.  Accordingly, even if a motion in limine to exclude the deoxyribonucleic acid (DNA) evidence would have been unsuccessful because the Commonwealth could have provided the statistical information, the result of a challenge would have accomplished something material for the defense.  Satterfield, 373 Mass. at 115.  See Mattei, 455 Mass. at 852 (lack of nonexclusion statistics could mislead jury into

Because this error is intertwined with the defendant's other challenges relating to the DNA evidence, we reserve our discussion regarding prejudice until after we discuss the remaining claims.

ii. Y-STR evidence. The defendant next argues that the Y-STR results should not have been admitted without a confidence interval. We disagree. Our case law requires that nonexclusion DNA evidence be presented to a jury with "reliable accompanying evidence as to the likelihood that the test could not exclude other individuals in a given population" so that the jury can "evaluate the meaning of the result." Mattei, 455 Mass. at 852. See Commonwealth v. Evans, 469 Mass. 834, 851-852 (2014) (applying Mattei to Y-STR testing). This requirement was satisfied because the counting method was a reliable method for providing such evidence at the time of trial.[11] Although

---

believing results are similarly significant to "exceedingly infinitesimal random match probabilities" routinely presented with match results). Moreover, the defendant argues that the Commonwealth would not have been able to produce the statistics in a timely manner if trial counsel had objected during Hickey's testimony. Whether or not this factual assertion is valid, counsel's failure to challenge the PCR results satisfied the first prong of the test for ineffective counsel, even if it was unlikely that a motion in limine would have been granted. Saferian, supra at 96 (first prong analyzes whether counsel's behavior fell "measurably below that which might be expected from an ordinary fallible lawyer").

[11] Dr. Robin Cotton testified that scientific literature at the time of trial endorsed the use of the "count" method. Although Bourke provided evidence that scientific literature

guidelines now suggest the use of a confidence interval to make the statistics from the counting method more conservative, see Y-STR Guidelines, supra,[12] the counting method as explained in Hickey's trial testimony provided sufficient context for the results.

Hickey provided context for the Y-STR nonexclusion result by providing the database frequency counts to the jury and explaining that "count" information is limited because it is only as good as the entries in the database and a Y-STR profile is identical through a paternal line.  Although a confidence interval is more favorable to defendants because it corrects for limitations with the counting method,[13] the "count" evidence was

---

existed at the time of trial discussing the use of confidence intervals with Y-STR testing, the defendant did not establish that confidence intervals were routinely used at that time.

[12] At the hearing on the motion for a new trial, the defendant introduced an article written in 2007 that recommends the use of a confidence interval calculation to "correct for possible sampling error" after a count has been done.  The defendant also submitted guidelines promulgated in 2009 by the Scientific Working Group on DNA Analysis Methods, an influential source in the forensic community, which suggests that a "count without a confidence interval is acceptable as a factual statement regarding observations in the database" but a "confidence interval corrects for database size and sampling variation" and provides methods to calculate a confidence interval if such is applied.  See Scientific Working Group on DNA Analysis Methods, Y-Chromosome Short Tandem Repeat (Y-STR) Interpretation Guidelines, 11 Forensic Science Communications, Federal Bureau of Investigations (Jan. 2009) at § 5.3.

[13] Using the Caucasian database in this case as an example, the confidence interval calculation increases the likelihood of

not unreliable, nor was it likely to mislead jurors into thinking that the probability of another person contributing the male DNA in the fingernail clippings was diminutive.  The purpose of requiring statistical evidence is to allow the jury to evaluate the significance of DNA results.  Evans, 469 Mass. at 851, quoting Commonwealth v. Bizanowicz, 459 Mass. 400, 409-410 (2011).  There was no error because the "count" evidence provided the required context.[14]

iii.  Prosecutor's statements regarding DNA evidence.  We agree with the motion judge that the prosecutor misstated evidence in her opening statement and closing argument.  The prosecutor's assertion in the opening statement that the defendant could not "be excluded" as the "major contributor" to the fingernail clippings was inconsistent with Hickey's testimony that the defendant could not be excluded as a contributor to the mixed profile.  Likewise, the claim in the closing argument that the difference between nonexclusion in Y-STR testing and a "match" is a "matter of semantics" conflicted with Hickey's testimony.  Hickey explained to the jury the meaning of "nonexclusion" in Y-STR testing by describing the

---

a match in the population from one in 1,311 profiles to one in 443.

[14] We now encourage, without deciding whether it is required, the use of a confidence interval when reporting Y-STR nonexclusion testimony.

significant limitations that are not applicable to PCR testing, where the word "match" is used.  The defendant did not object, and the jury were instructed that the opening statement and closing argument were not evidence.

iv.  Cross-examination regarding DNA evidence.  We reject the defendant's claim that trial counsel's cross-examination regarding the DNA evidence was ineffective.  Counsel testified that he "completely shifted focus" from the lack of statistics accompanying the PCR results because Bourke told him that the defendant's DNA was found on the samples.[15]  Instead, he made a tactical decision to highlight mistakes in investigation, such as contamination, and to argue that the DNA found on the victim did not belong to the defendant.[16]  We review a tactical or strategic decision by trial counsel to determine whether the decision was "'manifestly unreasonable' when made." Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), quoting

---

[15] The defendant disputed that this statement was actually made, describing it at the motion hearing as a "miscommunication."  The motion judge did not make any findings about whether this statement was made, but he did credit trial counsel's testimony that this statement affected his evaluation of the DNA evidence.  The motion judge determines matters of credibility.  Commonwealth v. Walker, 443 Mass. 213, 224 (2005), citing Commonwealth v. Bernier, 359 Mass. 13, 16 (1971).

[16] Although trial counsel averred that his failure to file a motion in limine or conduct additional cross-examination was not tactical, his testimony, explaining that he changed his trial strategy after speaking with Bourke, suggests otherwise.  The motion judge did not make any findings in this regard.

Commonwealth v. Acevedo, 446 Mass. 435, 442, 845 (2006). There were significant concerns with the evidence that counsel could have highlighted -- contamination and initial findings of seminal fluid that were later revised -- and counsel was faced with the damaging fact that his client could not be excluded as a contributor of the DNA found on the victim's fingernails while Weir, the only third-party culprit in the case, was excluded. We determine whether a decision was manifestly unreasonable by "search[ing] for rationality in counsel's strategic decisions, taking into account all the circumstances known or that should have been known to counsel in the exercise of his duty to provide effective representation to the client and not whether counsel could have made alternative choices." Kolenovic, 471 Mass. at 674-675, citing Commonwealth v. Walker, 443 Mass. 213, 227-228 (2005). Although the PCR evidence should not have been admitted without statistics, counsel was not ineffective for failing to cross-examine on this issue or about the Y-STR results in light of the advice he had received from his expert and the risk of highlighting the DNA evidence after Weir was excluded as a contributor.[17]

---

[17] Trial counsel retained Bourke to educate him regarding DNA and, after counsel had worked closely with Bourke on a number of issues before trial, Bourke did not advise counsel that there was any issue with the Y-STR evidence. Bourke may not now suggest that counsel was at fault for failing to ask about specifics of Y-STR results, a testing method in its

v. <u>Prejudice</u>.  Although the admission of the PCR results without statistics was erroneous, the defendant is not entitled to a new trial on this ground.  The defendant argues that he was prejudiced because the PCR evidence without statistics created a grave risk of misleading the jury into believing that the defendant was the only possible contributor of the male DNA found on the victim's fingernail scrapings and that landscaping activities or her physical contact with others as a former hairdresser were other possible explanations.  Applying the test "whether [the] error was likely to have influenced the jury's conclusion," <u>Wright</u>, 411 Mass. at 682, the defendant's claim of prejudice is easily dismissed.  The possibility that the DNA evidence could have come from an unknown third party was of limited value where the defendant named Weir as the culprit and where fresh scratches on the defendant's face the night of the murder supported an inference that it was actually the defendant's DNA that was found on the victim's fingernails.  Both the PCR evidence and the properly admitted Y-STR evidence

---

infancy at the time, without having alerted counsel to any potential issues.  See <u>Commonwealth</u> v. <u>Kolenovic</u>, 471 Mass. 664, 676 (2015) (expert's failure to correct counsel's approach after consultation permits assumption that trial counsel's strategy was acceptable).  Moreover, counsel sent a copy of the defendant's motion for discovery of tests employed and data results to Bourke before filing it, asking him if counsel should request anything else.  Counsel testified that he stopped considering a challenge to the DNA after Bourke told him that DNA found on the victim belonged to the defendant.

excluded Weir as a contributor to any of the DNA found on the victim.  Thus, we can discern no prejudice where the result of any confusion that could have occurred was of limited value to the defendant and, more importantly, the Commonwealth presented substantial other evidence against the defendant.

The defendant argues that the erroneously admitted DNA evidence was "critical" because it corroborated Weir's testimony naming the defendant as the killer and, for that reason, was prejudicial.  We disagree.  First, the defendant gave a version of the cause of the scratches on his face to police on the night of the murder that was different from the one he testified to at trial.  See Commonwealth v. Montecalvo, 367 Mass. 46, 52 (1975) (intentionally false and misleading statements to police demonstrate consciousness of guilt).  Additionally, the defendant, not Weir, said prior to the murder that he could kill the victim in a manner that was almost exactly the same way that she died.  The defendant told another friend after the murder that it was a "perfect crime."  Lastly, it was the defendant, not Weir, who was present at the victim's apartment when the police arrived on the night of the murder.  Unlike Mattei, 455 Mass. at 856, where the DNA evidence was "crucial," the Commonwealth provided strong corroborative evidence that the defendant had committed the murder.  Accordingly, there was no substantial likelihood of a miscarriage of justice.

The prosecutor's misstatements, which insinuated to the jury that the probability of "nonexclusion" in Y-STR results was as significant as a "match" in PCR results, compounded the error in the admission of the PCR results but added nothing to the prejudice calculus sufficient to raise it to a level that would entitle the defendant to relief. In reviewing whether a prosecutor's misstatements require reversal, we consider "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave to the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusion." Commonwealth v. Wood, 469 Mass. 266, 285 (2014), quoting Commonwealth v. Lewis, 465 Mass. 119, 130-131 (2013). Here, the prosecutor's misstatements do not require reversal because trial counsel did not object, the judge's instructions mitigated the errors, and the comments were not likely to influence the jury's conclusion where, as the motion judge found, this "case did not hinge on the DNA evidence." See Wood, supra.

3. Admission of Weir's prior consistent statements. The defendant argues that trial counsel was ineffective in

introducing the audiotapes between Weir and Morel,[18] which included statements made by Weir naming the defendant as the assailant, asserting that he was "in shock" during the attack because he never expected it to happen, and limiting his role to moving the victim down the stairs and helping to clean up. Moreover, Weir indicated on the tape that the defendant suggested another murder. In his motion for new trial, the defendant argued that "the tapes added nothing by way of impeachment, other than showing Weir's tone of voice," because trial counsel effectively cross-examined Weir prior to playing the tapes. The motion judge rejected the defendant's claim, concluding that it was not manifestly unreasonable to introduce the tapes because "some, if not all, of Weir's statements" would have been admissible after the defendant opened the door through impeachment. On appeal, the defendant concedes that the tapes were "unflattering" to Weir and therefore disputes that it was inevitable that the prosecutor would have played the tapes.

"Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference." Commonwealth v. Hudson, 446 Mass. 709, 715 (2006), quoting Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). "Failure to use a particular method of

---

[18] Before trial, counsel moved to suppress the tapes. When unsuccessful, counsel decided to introduce the entirety of the tapes for impeachment purposes.

impeachment does not constitute ineffective assistance of counsel." Commonwealth v. Johnston, 467 Mass. 674, 696 (2014). "[A]bsent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." Hudson, supra, quoting Fisher, supra.

Trial counsel explained that he made a tactical decision to introduce the entirety of the tapes because he thought it was important for the jury to hear Weir "bragging about what a good liar he was and how he could beat a polygraph," and to "hear the inflection in his voice" when talking about the murder -- that he "laughed" and "joked" about the killing.[19] We agree with the motion judge that counsel's decision was not manifestly unreasonable. The Commonwealth's case hinged on Weir's testimony as it was undisputed that only three people were present at the time of the murder -- the defendant, Weir, and the victim -- and the defendant and Weir were each pointing the finger at the other. Thus, impeaching Weir's version of events was paramount to the defendant's case.

---

[19] Although trial counsel noted that, in hindsight, it may have been helpful to redact portions of the tape, at the time of trial, he decided "in spite of the effect that the prior consistent statement could have had on Weir's testimony," that "it was important to hear the whole thing." He stated that his decision was guided by the need to impeach Weir, noting that "[t]here was nothing more important."

The tapes allowed trial counsel to impeach Weir in multiple ways. First, the tapes impeached Weir's credibility through specific examples of Weir's prior misconduct that may not otherwise have been admitted. For example, Weir told Morel that he stole $250 per day while working at a doughnut shop.[20] The prosecutor objected to playing the full tapes on this ground, but the trial judge admitted the evidence because trial counsel made the tactical decision to offer bad acts of both the defendant and Weir that were discussed on the tapes. Although "specific acts of misconduct of a witness, not material to the case in which [he] testifies, are ordinarily inadmissible on cross-examination to impeach [his] credibility," Commonwealth v. Martin, 467 Mass. 291, 310 (2014), citing Commonwealth v. LaVelle, 414 Mass. 146, 151 (1993), admissibility "lies in large measure in the discretion of the trial judge," LaVelle, supra at 152, quoting Commonwealth v. McGeoghean, 412 Mass. 839, 841 (1992). Although trial counsel impeached Weir with this information before playing the tapes, the trial judge had allowed the bad act evidence because of counsel's decision to play the tapes in full.[21]

---

[20] The tapes also contained Weir's statements referencing a prior arrest, a theft from a "guitar center," and other incidents of "B & Es" and "larceny."

[21] The prosecutor noted that she did not object to this line of questioning because of the judge's ruling.

Next, the tapes revealed the inflection in Weir's voice when talking about the murder and Weir's boasting about his ability to lie. For example, Weir testified that he only helped move the victim's body down a couple of the stairs before telling the defendant, "I'm not doing this, man, this is all you"; but he told Morel that moving the victim's body downstairs was "just like lugging a fuckin' bag of potatoes." Additionally, Weir told Morel that he could pass a polygraph test by "creat[ing] an alternative persona," becoming "a different person," and training to "make yourself believe that you're someone else."

The defendant argues that the prior consistent statements strongly bolstered Weir's credibility because the statements were made to a friend. Offsetting that consideration, however, was evidence contained on the tapes demonstrating Weir's motive to lie to Morel. Weir told Morel that he was asked whether he and the defendant "killed a lady and then threw her down the stairs," a question he suspected arose from Anthony telling a friend about the murder. Considering that Weir told Morel numerous times that there was no proof he was at the victim's home the day of the murder, and he could only get caught if one

of the three started talking, the rumor implicating Weir in the murder provided motive to diminish his involvement.[22]

The defendant also takes issue with trial counsel playing the portion of the tape containing Weir's statement that the defendant suggested murdering a "bum." The context of this statement, however, is just as, if not more, harmful to Weir as the defendant because Weir immediately followed that statement with the admission that he, not the defendant, then assaulted the individual.

Although the tapes included statements detrimental to the defendant and Weir's prior consistent statements, they provided numerous benefits for impeaching Weir's version of events, and counsel's strategic choice of method for impeachment was not manifestly unreasonable. See Johnston, 467 Mass. at 696.

4. Admission of Weir's unredacted plea agreement. At the start of the trial, the judge granted the defendant's motion to redact the word "truthfully" from Weir's plea agreement in two out of three instances. During trial, however, trial counsel introduced the unredacted plea agreement, noting that he would not publish it to the jury until it was properly redacted. The final version submitted to the jury did not have "truthfully" redacted. The judge instructed the jury at least twice that it

---

[22] Shortly before the tapes were played, Weir testified that he did not remember hearing this rumor.

was the jury's responsibility to determine whether Weir was truthful, regardless of the fact that Weir made an agreement to be "truthful."

The defendant argues that the unredacted plea agreement violated his right to a fair trial under the Sixth Amendment to the United States Constitution by providing "extraneous matter" to the jury and that trial counsel was ineffective in this respect. The Commonwealth does not dispute that failure to redact was an error, but argues that the error did not prejudice the defendant. See Commonwealth v. Ciampa, 406 Mass. 257, 262 (1989) ("Repeated references to [a] witness's obligation to tell the truth should [be] deleted" from plea agreement).

The defendant's arguments are unavailing. The two references to "truthful" were not extraneous because they were cumulative of the one permissible reference. See Commonwealth v. Greineder, 458 Mass. 207, 247-248 (2010), remanded by 133 S. Ct. 55 (2012), aff'd, 464 Mass. 580 (2013) (information not extraneous when cumulative of evidence at trial). Moreover, any prejudice created by the error was minimized by the judge's clear and forceful instructions to the jury that it was "solely for the jury to determine" credibility and "whether Mr. Weir's testimony [was] truthful or not." See Commonwealth v. Marrero, 436 Mass. 488, 502 (2002) ("effect of [clear and forceful] charge was to dispel any implication inherent in the agreement

that the prosecutor warranted that [the witness] was telling the truth").  Accordingly, there was no substantial likelihood of a miscarriage of justice created by the failure to redact the two extra references to "truthful" on Weir's plea agreement.  Id.

5.  Testimony regarding the defendant's bad acts.  The defendant next argues that the prosecution improperly attacked his character through bad act evidence and that counsel was ineffective for failing to object.  The defendant points to two specific examples:  (1) several witnesses testified, in essence, that the defendant, Anthony, and Weir "trashed" the victim's home after her death and it became in "disarray"; and (2) the victim's sister-in-law, who was seventy-eight years old at the time of trial, testified that the defendant told her to go "f" herself.

Although evidence of prior or subsequent bad acts "may not be offered to prove bad character or criminal propensity, such evidence may be admitted for another purpose where its probative value is not substantially outweighed by the danger of prejudice."  Commonwealth v. Holliday, 450 Mass. 794, 815, cert. denied, 555 U.S. 947 (2008), citing Commonwealth v. Stroyny, 435 Mass. 635, 641 (2002).  See Commonwealth v. Source One Assocs., 436 Mass. 118, 129 & n.13 (2002) (principles regarding prior bad act evidence applicable to subsequent acts).  Bad act evidence may be admitted to show "a common scheme, pattern of operation,

absence of accident or mistake, identity, intent or motive."
Commonwealth v. Gollman, 436 Mass. 111, 113-114 (2002), quoting
Commonwealth v. Helfant, 398 Mass. 214, 224 (1986).  Postcrime
conduct "must be connected with the facts of the case or not be
too remote in time" to be sufficiently probative.  Commonwealth
v. Cardarelli, 433 Mass. 427, 434 (2001), quoting Commonwealth
v. Barrett, 418 Mass. 788, 794 (1994).

Without deciding whether the trial judge would have
sustained an objection to this evidence, the motion judge
concluded that trial counsel was not ineffective for failing to
object because the evidence "could not have had appreciable
significance to the jury's verdict" in light of the evidence
concerning the "brutal killing of an eighty-four year old woman
in her home and [the defendant's] methodical actions to make her
death seem accidental."  We agree.

We discern no error in admission of evidence of the
condition of the victim's home and the handling of her personal
possessions.  See Commonwealth v. Mendes, 441 Mass. at 466-467
(postcrime spending habits relevant to motive and ability to
"pursue . . . lifestyle freely" after obtaining "control of her
inheritance").  Moreover, the evidence was correspondingly
damaging to Weir.  The neighbors testified that they often saw
the defendant and Weir staying at the home after the murder and
indicated that both were responsible for the damage.  We assume,

without deciding, that the admission of the defendant's statement to the victim's sister-in-law was error.[23]  We agree, however, with the motion judge that this singular comment was not likely to affect the jury's verdict where, in addition to evidence of the brutal killing, the jury heard evidence that the defendant called the victim a "bitch," a "cunt," and a "douchebag," and that he made jokes about her death.

6.  Defendant's decision to testify.  The defendant argues that it was manifestly unreasonable for trial counsel to advise him to testify because testifying allowed impeachment through evidence of prior inconsistent statements he made the night of his arrest.  Counsel acknowledged he was aware of the statements but advised the defendant to testify because he believed the defendant was innocent and it was the only way to fully present the defense that Weir had committed the murder.  The motion judge rejected the defendant's claim because of the "strength" of the Commonwealth's case.

---

[23] The Commonwealth argues that the evidence was relevant to the defendant's state of mind at the time of the murder because the defendant's interaction with the victim's sister-in-law demonstrated his attitude toward residents at the victim's home. The case cited by the Commonwealth, Commonwealth v. Riley, 467 Mass. 799 (2014) is inapposite.  In Riley, supra at 818, bad act evidence relating to three children all "living in the same household [with] no evidence that the defendant treated any of his children in a noticeably different manner" was relevant to the state of mind regarding only one child.  In this case, however, the defendant's actions were toward a relative living in a separate apartment within the same building.

Where the Commonwealth has a strong case against the defendant and advising the defendant to testify may provide the only "realistic chance" at acquittal, such advice is not manifestly unreasonable. See Commonwealth v. Sharpe, 454 Mass. 135, 147 (2009). Additionally, trial counsel testified at the motion hearing that he had had many conversations with the defendant about whether to testify and that the defendant decided to testify after counsel advised him that it was ultimately his decision. The defendant's informed and voluntary decision to testify undermines his claim. Commonwealth v. LaCava, 438 Mass. 708, 716 (2003). Advising the defendant to testify to his version of events was not manifestly unreasonable where compelling evidence corroborated Weir's version.

7. Prior consistent statements. The defendant testified that he told three friends that Weir had killed the victim. During a voir dire, one of those friends testified that the defendant said, "[Weir] did it," in front of her and another of the friends during the month following the murder.[24]

The defendant argues that trial counsel was ineffective for failing to call two of the friends as surrebuttal witnesses to testify to the defendant's prior consistent statements. Counsel

---

[24] The voir dire was held because trial counsel sought to have the self-serving statements admitted. The trial judge excluded the evidence because there was insufficient evidence that Weir had heard the statement.

testified at the motion hearing that he thought that the witnesses, based on their trial testimony, may be hostile to the defendant. He conceded however, that the decision not to call them was not well thought out. The motion judge rejected the defendant's claim after finding that the decision was strategic and concluded that it was not manifestly unreasonable. We agree.

8. Cumulative effect of the asserted errors. Last, the defendant contends that even if the asserted errors do not warrant reversal of his convictions when considered independently, their combined effect nonetheless gives rise to a substantial likelihood of a miscarriage of justice. We reject this argument. Even if we were to agree that all of the challenged evidence should not have been admitted, the Commonwealth presented other substantial evidence corroborating Weir's testimony: the defendant's presence at the victim's home the night of the murder; the scratches on his face and varying explanations for the cause; his frequent precrime references to killing the victim, sometimes stating the exact method that occurred; and his postcrime statement that it was the "perfect crime."

9. Relief pursuant to G. L. c. 278, § 33E. We have examined the record pursuant to our duty under G. L. c. 278,

§ 33E, and we discern no basis on which to grant the defendant relief.

Conclusion.  The judgment of conviction of murder in the first degree is affirmed.  The order denying the defendant's motion for a new trial is also affirmed.

So ordered.